## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ELIZABETH WADE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:18-cv-00801-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **the Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), Elizabeth Wade seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied her claim for a period of disability and disability insurance benefits.  After careful review, the Court reverses the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Wade applied for a period of disability and disability insurance benefits on March 27, 2015.  (Doc. 6-3, p. 23; Doc. 6-6, p. 2).  Ms. Wade alleges that her

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the proper defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

disability began June 19, 2014. (Doc. 6-5, p. 74; Doc. 6-6, p. 2). The Commissioner initially denied Ms. Wade's claim. (Doc. 6-3, p. 23; Doc. 6-7, p. 2). Ms. Wade requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-3, p. 23; Doc. 6-7, p. 9). The ALJ issued an unfavorable decision. (Doc. 6-3, pp. 20, 38). The Appeals Council declined Ms. Wade's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence" or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and

citation omitted). If the ALJ's decision is supported by substantial evidence, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.  SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Wade meets the insured status requirements through December 31, 2019. (Doc. 6-3, p. 26). Ms. Wade has not engaged in substantial gainful activity since June 19, 2014, the onset date. (Doc. 6-3, p. 26). The ALJ determined that Ms. Wade suffers from the following severe impairments: history of adhesions with pelvic/abdominal pain, history of lumbar spondylosis with stenosis with L4 and L5 decompressive laminectomies and foraminotomies with back pain and sciatica, degenerative joint disease of the knee, and chronic lymphocytic leukemia in remission. (Doc. 6-3, p. 26).[2] The ALJ found that Ms. Wade suffers from the following non-severe physical impairments: hyperlipidemia, vitamin D deficiency, tobacco use disorder, abscesses with cellulitis, benign colon polyp, sigmoid diverticulosis, hemorrhoids, hiatal hernia with mild erosive esophagitis, diffuse gastritis, history of MRSA infection, irritable bowel syndrome, history of breast reduction surgery, history of bladder sling times two, TMJ syndrome, and headaches. (Doc. 6-3, p. 30). The ALJ determined that

_____

[2] "[T]he phrase 'spondylosis of the lumbar spine' means degenerative changes such as osteoarthritis of the vertebral joints and degenerating intervertebral discs (degenerative disc disease) in the low back." https://www.emedicinehealth.com/spondylosis/article_em.htm (last visited July 3, 2019). Lowe back stenosis is "a narrowing of the spinal canal, compressing the nerves traveling through the lower back into the legs." https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Lumbar-Spinal-Stenosis (last visited July 30, 2019). A decompressive laminectomy "is the most common type of surgery done to treat lumbar (low back) spinal stenosis." https://www.uwhealth.org/health/topic/surgicaldetail/decompressive-laminectomy-for-lumbar-spinal-stenosis/aa122359.html (last visited July 30, 2019). A foraminotomy is a surgery that "enlarges the area around one of the bones in [a person's] spinal column. The surgery relieves pressure on compressed nerves." https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/foraminotomy (last visited July 30, 2019).

Ms. Wade's anxiety, somatic symptom disorder, and depressive disorder with dysthymic syndrome are non-severe mental impairments. (Doc. 6-3, pp. 31, 33). Based on a review of the medical evidence, the ALJ found that Ms. Wade does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 33).

The ALJ determined that Ms. Wade has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) except with occasional stooping and crouching; no right lower extremity pushing or pulling; and no climbing. (Doc. 6-3, p. 34). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). The ALJ concluded that Ms. Wade is able to perform her past relevant work as a licensed practical nurse, work that Ms. Wade previously did in a nursing home, because this position does not require work-related activities precluded by Ms. Wade's RFC. (Doc. 6-3, p. 38; Doc. 6-5, p. 80).[3] Accordingly, the ALJ determined

---

[3] At the administrative hearing, Ms. Wade explained that when she worked at the nursing home, she specialized in completing and sending minimum data sets (MDSs) to Medicare and Medicaid for payment. (Doc. 6-5, p. 80). "MDS is part of the federally mandated process for clinical assessment of all residents in Medicare and Medicaid certified nursing homes. This process provides a comprehensive assessment of each resident's functional capabilities and helps nursing home staff identify health problems." https://www.cms.gov/research-statistics-data-and-systems/computer-data-and-systems/minimum-data-set-3-0-public-reports/index.html (last visited July 30, 2019). The MDS position involved sitting for computer work and standing and walking for assessing patients. (Doc. 6-5, pp. 80-81). Ms. Wade occasionally would fill in as a

that Ms. Wade has not been under a disability within the meaning of the Social Security Act. (Doc. 6-3, p. 38).

## IV.    ANALYSIS

Ms. Wade argues that she is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate her claim under the Eleventh Circuit pain standard. (Doc. 11, p. 5). Based on its review, the Court finds that the record does not contain substantial evidence to support the ALJ's negative credibility determination as it pertains to the ALJ's conclusion that Ms. Wade can perform medium work.[4]

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r of Soc. Sec.*, No. 18-11954, 2019 WL 1975989, at *3 (11th Cir. May 3, 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the

---

floor nurse. (Doc. 6-5, p. 81). The floor nurse position involved pushing a cart, giving out medicine, and taking care of patients. (Doc. 6-5, p. 81).

[4] The administrative record for Ms. Wade's case is extensive. Large portions of the record do not pertain to the relevant disability period (Doc. 6-11; Doc. 6-12; Doc. 6-13, p. 26-44, 75-83, 97-112; Doc. 6-14, p. 12-13; Doc. 6-15, p. 2-16, 60-89; Doc. 6-19, p. 10-11, 29-39; Doc. 6-30, p. 4-45, 83) or to Ms. Wade's severe impairments (Doc. 6-13, p. 19-22, 50-62; Doc. 6-15, p. 10-16, 23-31, 36-54, 64-81; Doc. 6-17, p. 44-48; Doc. 6-24, p. 28-73; Doc. 6-25, p. 12-20; Doc. 6-26, p. 8-14; Doc. 6-30, p. 4-45, 54-58, 63-65, 74-75).

severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r of Soc. Sec.*, No. 18-11708, 2019 WL 1758438, at *2 (11th Cir. Apr. 18, 2019) (citing *Wilson*). If the ALJ does not demonstrate "proper application of the three-part standard[,]" reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225; *Coley*, 2019 WL 1975989, at *3. As a matter of law, the Secretary must accept the claimant's testimony if the ALJ inadequately or improperly discredits it. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v.Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a

claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Concerning the ALJ's burden when discrediting a claimant's subjective symptoms, SSR 16-3p clarifies:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10. Additionally, in evaluating a claimant's reported symptoms, an ALJ must consider the following factors:

> (i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Ms. Wade's medical records and daily activities do not support her testimony regarding her subjective pain and limitations. (Doc. 6-3, pp. 35-37). An ALJ may discount a claimant's pain based on conflicting evidence in medical records and in reports of daily activities. *See Crow*, 571 Fed. Appx. at 808 ("Given Crow's quick and sustained improvement using prednisone, and daily activity that indicated a greater capacity for work than alleged, the ALJ made a clearly articulated credibility finding that was supported by substantial evidence.") (citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995)); *Loveless v. Massanari*, 136 F. Supp. 2d 1245, 1249-1250 (N.D. Ala. 2001) (affirming the ALJ's decision to discredit the claimant's subjective pain testimony because it did not align with the claimant's objective medical evidence and reported daily activities). Accordingly, the Court first examines Ms. Wade's testimony and then compares her testimony to the medical evidence in the record and to the evidence relating to her daily activities.

*A. Ms. Wade's Testimony*

At the administrative hearing on August 2, 2017, Ms. Wade testified that she was 58 years old. (Doc. 6-5, pp. 69, 78, 79). Ms. Wade stopped working in 2014 because she did not recover well from a surgical procedure (pelvic), and she began experiencing back problems which required additional surgery. (Doc. 6-5, pp. 74-75). Ms. Wade stated that she suffered from back, abdominal, and knee pain, and she lacked energy. (Doc. 6-5, pp. 75, 78).[5] Ms. Wade stated that her pain and fatigue prevented her from working. (Doc. 6-5, pp. 75, 78). Ms. Wade was using a pain management plan to treat her pain, taking oxycodone (20 mg) four times daily. (Doc. 6-5, p. 76).[6] Medication helped Ms. Wade manage her pain, but she reported that medication did not eliminate her pain. (Doc. 6-5, p. 76).

On a scale of one to ten – with ten being pain so severe a person would need to go to the emergency room – at the administrative hearing, Ms. Wade rated her pain as a six with rest and medication. (Doc. 6-5, p. 76). Ms. Wade stated that her pain increased to eight with activity. (Doc. 6-5, p. 76). Ms. Wade stated that she was most comfortable in a recliner and reclined "four and a half to five hours" daily to manager her pain. (Doc. 6-5, p. 77). Ms. Wade has received pain injections for

---

[5] Ms. Wade's leukemia is currently in remission. (Doc. 6-5, p. 78). Still, she has to be careful about sores and infection. (Doc. 6-5, p. 78).

[6] Doctors prescribe oxycodone "to treat moderate to severe pain." https://www.goodrx.com/oxycodone-acetaminophen/images (last visited June 28, 2019).

her back and knees.  (Doc. 6-5, p. 78).  Ms. Wade stated that the last knee injections before the administrative hearing helped a little bit, but other pain procedures did not.  (Doc. 6-5, p. 78).

Ms. Wade and her husband have three children ages ten, six, and five. (Doc. 6-5, p. 76).  Ms. Wade does household chores with a lot of help from her husband. (Doc. 6-5, p. 76).  Her oldest child helps too.  (Doc. 6-5, p. 77).

Ms. Wade breaks up chores because of her pain:  "Yeah, it takes a little bit, you know.  I'll go and I'll sweep … then I go and I rest because it'll stir my back up."  (Doc. 6-5, p. 76).  Ms. Wade drives her children to and from school, which is a quarter mile from home.  (Doc. 6-5, p. 76).  She drives herself and her children to doctor's appointments.  (Doc. 6-5, pp. 76-77).  Ms. Wade testified that she occasionally shops for groceries, but her "husband does the most part."  (Doc. 6-5, p. 77).

*B.  Medical Records*

Ms. Wade maintains that the ALJ did not consider the totality of her medical records when making his determination about her credibility, and she argues that the medical records that the ALJ overlooked are consistent with her pain testimony. (Doc. 11, p. 7); *see Chambers v. Astrue* 671 F. Supp. 2d 1253, 1258 (N.D. Ala. 2009) (An ALJ "cannot pick and choose among a doctor's records to support his own conclusion.").  The record supports Ms. Wade's argument.  The ALJ identified

pieces of objective evidence which, in isolation, call into question Ms. Wade's testimony about the intensity of her pain. But the ALJ ignored evidence that undermines his conclusion that Ms. Wade can perform medium work.

The ALJ discussed Ms. Wade's medical records from the Alabama Pain Physicians, The Birmingham Pain Center (BPC), Dr. Jack Denver, Dr. Joanne Rossman of Alabama Oncology, and Dr. Dallas Russell covering the disability period from June 2014 to May 2017. (Doc. 6-3, p. 27-29). The ALJ determined that medical records support Ms. Wade's reported impairments, but the records do not indicate a disabling degree of pain or limitations. (Doc. 6-3, p. 34-35).[7] The ALJ stated that the records show that Ms. Wade's "pain has improved with treatment[.]" (Doc. 6-3, p. 35). That is true. The ALJ also relied on Ms. Wade's testimony that medication has helped with pain. (Doc. 6-3, p. 35). That is true too, but that does not mean that substantial evidence supports the ALJ's finding that Ms. Wade can perform medium work.

Ms. Wade's medical records indicate that she had pelvic surgery in 2012 to remove a mass. (Doc. 6-12, p. 84). In August of 2013, Ms. Wade's primary care physician, Dr. Livingston, referred her to the Alabama Pain Physicians for pelvic

_____

[7] In *Early v. Astrue*, 481 F. Supp. 2d 1233 (N.D. Ala. 2007), a district court determined that an ALJ's similarly worded interpretation of the pain standard's third prong was improper. *See Early*, 481 F. Supp. 2d at 1238. The third prong requires the ALJ to evaluate whether "'the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.'" *Early*, 841 F. Supp. 2d at 1238 (quoting *Foote*, 67 F.3d at 1560).

pain. (Doc. 6-12, pp. 83, 84). Post-surgery scar tissue was causing Ms. Wade "aching, stabbing, sharp, shooting, [and] throbbing" pain primarily in her left pelvic region. (Doc. 6-12, p. 84). Ms. Wade described her pain as seven generally and nine at worst. (Doc. 6-12, p. 84). "[S]itting, standing, physical activity, coughing/sneezing . . . . [and] [s]tretching" worsened Ms. Wade's pain. (Doc. 6-12, p. 84). Medication and lying down in a fetal position helped Ms. Wade's pain. (Doc. 6-12, p. 84). The Alabama Pain Physicians also treated Ms. Wade for knee pain in 2013. (*See* Doc. 6-12, pp. 93, 94) (October 3, 2013 treatment record referencing pelvic and knee pain); (Doc. 6-12, pp. 99, 100) (October 25, 2013 treatment record referencing pelvic and knee pain).

The Alabama Pain Physicians continued to treat Ms. Wade for pelvic pain in 2014. In January 2014, medication had improved Ms. Wade's pelvic pain by 65%. (Doc. 6-12, pp. 31, 32). Ms. Wade's ability to perform daily activities had increased. (Doc. 6-12, p. 32). Ms. Wade reported no severe side effects from her medication. (Doc. 6-12, p. 39).

Ms. Wade also reported back pain in 2014. (*See* Doc. 6-12, pp. 46, 47) (February 11, 2014 treatment record referencing abdominal and back pain); (Doc. 6-12, pp. 52, 53) (March 5, 2014 treatment record referencing abdominal and back pain); (Doc. 6-12, pp. 58, 59) (April 1, 2014 treatment record referencing abdominal and back pain). In March of 2014, Dr. Martin, a pain doctor, gave Ms. Wade a

lumbar transforaminal epidural steroid injection. (Doc. 6-12, pp. 89, 92).[8] Ms. Wade's back pain score did not change after the procedure. (Doc. 6-12, p. 91). Dr. Martin scheduled Ms. Wade for a pudendal nerve block. (Doc. 6-12, p. 92).[9] Dr. Martin gave Ms. Wade another ESI in April 2014. (Doc. 6-12, p. 75). Ms. Wade reported a pain score of seven and a half before the injection and a four afterwards. (Doc. 6-12, p. 76).

In June of 2014, Ms. Wade's condition deteriorated. She was experiencing constant pelvic pain. (Doc. 6-12, pp. 77, 78). Medication reduced Ms. Wade's pain by 40%. (Doc. 6-12, p. 78). Ms. Wade described her pain as "aching, sharp, burning, throbbing and deep." (Doc. 6-12, p. 78). "[A]ctivity, inactivity, sitting, standing, walking, twisting, [and] bending" aggravated Ms. Wade's pain. (Doc. 6-12, p. 78). Ms. Wade reported no symptoms associated with her pain. (Doc. 6-12, p. 78). Despite the pain, Ms. Wade's ability to work and perform daily activities had improved. (Doc. 6-12, p. 78).

---

[8] "Epidural Steroid Injections (ESIs) are a common method of treating inflammation associated with low back related leg pain, or neck related arm pain. In both of these conditions, the spinal nerves become inflamed due to narrowing of the passages where the nerves travel as they pass down or out of the spine." https://www.spine.org/KnowYourBack/Treatments/Injection-Treatments-for-Spinal-Pain/Epidural-Steroid-Injections (last visited July 2, 2019).

[9] "The pudendal nerve is found in the pelvis." https://www.healthline.com/human-body-maps/pudendal-nerve#1 (last visited July 2, 2019).

In October 2014, Ms. Wade had back surgery to address her degenerative disc disease and spinal canal narrowing. (Doc. 6-13, p. 6). During a November 2014 visit with Dr. Chambers, a physician with UAB's Neurosurgery Clinic, Ms. Wade reported that she was doing well after her back surgery and that her "preoperative leg pain [had] resolved." (Doc. 6-13, p. 7). But Ms. Wade was experiencing "intermittent, moderately severe (7/10) left low back pain with occasional 'heaviness' in her lower extremities." (Doc. 6-13, p. 7).

Ms. Wade's primary care physician, Dr. Livingston, referred Ms. Wade to Dr. Chang with the BPC for an evaluation. (Doc. 6-17, pp. 14, 19). During her new patient visit with Dr. Chang in January 2015, Ms. Wade reported that her back and leg pain were worse than her pelvic and right knee pain. (Doc. 6-17, p. 14). Although surgery had improved her back pain, Ms. Wade had fallen and reinjured her back in November 2014. (Doc. 6-17, p. 14). Afterwards, Ms. Wade's back pain was "constant" and "stabbing, shooting, dull[ing], aching, pressure [causing], burning and tingling in quality." (Doc. 6-17, p. 14). Ms. Wade rated her pain "as 8 out [of] 10 currently" and "rang[ing] from a best of 5 out of 10 to a worst of 10 out of 10 in intensity[.]" (Doc. 6-17, p. 14).

Ms. Wade described having "persistent deep pelvic pain over time" after multiple abdominal procedures and knee pain for several years after tearing a ligament. (Doc. 6-17, p. 14). Ms. Wade stated that she had experienced weakness

and occasional buckling in her right knee. (Doc. 6-17, p. 14). Ms. Wade did not recall receiving knee imaging or injections for pain. (Doc. 6-17, p. 14).

Based on her medical history and clinical evaluation, Dr. Chang found that Ms. Wade "suffers from chronic pain from multiple locations." (Doc. 6-17, p. 18). Dr. Chang identified post-laminectomy syndrome, lumbar spondylosis, lumbar disc degeneration, thoracic neuritis, right knee joint pain, and chronic pain syndrome as sources of Ms. Wade's pain. (Doc. 6-17, p. 6).[10]

Dr. Chang developed a plan to address Ms. Wade's back and leg pain. (Doc. 6-17, p. 18). Dr. Chang started Ms. Wade on several medications including Amrix (a muscle relaxant), Cymbalta (a pain reliever and anti-depressant), "Oxycontin 15mg BID [twice daily,] and Percocet 10mg 325mg BID [twice daily] for breakthrough [pain]." (Doc. 6-17, p. 18).[11]

Dr. Chang and other BPC personnel treated Ms. Wade throughout 2015 and part of 2016. (*See* Doc. 6-16, p. 2) (listing 2015 BPC dates); (Doc. 6-22, p. 2)

---

[10] Neuritis is "an inflammatory or degenerative lesion of a nerve marked especially by pain[.]" https://www.merriam-webster.com/dictionary/neuritis (last visited July 30, 2019). Thoracic refers to the spinal nerves within the thoracic region—the "cavity in which the heart and lungs lie[.]" https://www.merriam-webster.com/medical/thoracic%20nerve (last visited July 30, 2019); https://www.merriam-webster.com/dictionary/thorax (last visited July 30, 2019).

[11] "Amrix (cyclobenzaprine hcl) is a muscle relaxant used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury." https://www.rxlist.com/amrix-side-effects-drug-center.htm (last visited June 20, 2019). Cymbalta or duloxetine treats chronic back pain, depression, and anxiety. https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited June 20, 2019).

(submitting BPC records from 2015 through 2016). Ms. Wade underwent an epidural steroid injection for back pain in February 2015. (*See* Doc. 6-16, pp. 39-45, 47-48, 50) (documents related to February 4, 2015 pain procedure).

In March 2015, Ms. Wade reported to Dr. Chang that "Cymbalta was not relieving any of her pain." (Doc. 6-16, p. 19). Dr. Chang adjusted Ms. Wade's medications by substituting Topamax for Cymbalta and returning her to Celexa. (Doc. 6-16, p. 19). Ms. Wade underwent a nerve block procedure. (*See* Doc. 6-16, pp. 15, 21, 24-25) (documents related to March 25, 2015 pain procedure).

Ms. Wade left a message in May 2015 that "her pain medication was not working" and requested an appointment. (Doc. 6-16, p. 3). The medical record does not indicate whether Dr. Chang saw Ms. Wade or adjusted her pain medication after this call.

During a visit in August 2015, Ms. Wade rated her pain as a seven out of ten. (Doc. 6-23, p. 45). Ms. Wade reported no problems with the effectiveness of her pain medications. (*See* Doc. 6-23, p. 45) (circling "Excellent" and indicating that "meds [and] rest" make pain better on August 11, 2015 intake form). In the beginning of September 2015, Ms. Wade's pain level had increased to nine. (Doc. 6-23, p. 35). Ms. Wade was experiencing a good degree of effectiveness with her medications. (Doc. 6-23, p. 35) (circling "Good" and indicating that "med[s] [and] rest" make pain better on September 10, 2015 intake form). Later in September, Ms.

Wade's pain level remained a nine. (Doc. 6-23, p. 20). Still, Ms. Wade had no concerns about her medications. (*See* Doc. 6-23, p. 20) (circling "Excellent" and indicating that "meds" make pain better on September 28, 2015 intake form).

During an October 2015 visit, Ms. Wade again reported her pain level as a nine. (Doc. 6-23, p. 10). Ms. Wade rated the effectiveness of her medications as good. (*See* Doc. 6-23, p. 10) (circling "Good" and indicating that "meds" make pain better on October 19, 2015 intake form). Ms. Wade described her pain as eight and a half in November 2015. (Doc. 6-22, p. 96). Ms. Wade's medications were above good in terms of effectiveness. (*See* Doc. 6-22, p. 96) (circling area in between "Good" and "Excellent" and indicating that "meds [and] rest" make pain better on November 16, 2015 intake form).

In December 2015, Ms. Wade's pain had decreased to an eight. (Doc. 6-22, p. 86). Ms. Wade reported that her medications were good at relieving pain. (*See* Doc. 6-22, p. 86) (circling "Good" and indicating that "meds [and] rest" make pain better on December 15, 2015 intake form).

Ms. Wade's BPC intake records from 2016 contain similar descriptions of her pain. (*See* Doc. 6-22, p. 74) (reporting eight and a half as current level, five as best, and nine as worst; circling "Good" and indicating that "meds [and] rest" make pain better on January 13, 2016 intake form); (Doc. 6-22, p. 63) (reporting eight as current level, six as best, and nine as worst; circling "Good" and indicating that "meds, rest[,

and] heat" make pain better on February 11, 2016 intake form); (Doc. 6-22, p. 52) (reporting seven as current level, five as best, and nine as worst; circling "Good" and indicating that "meds [and] rest" make pain better on March 10, 2016 intake form). Dr. Chang noted during the March 2016 visit that Ms. Wade's "pain [is] stable on current treatment regime."  (Doc. 6-22, pp. 54, 57).

Ms. Wade rarely reported side effects from her medications.  (*See* Doc. 6-23, p. 45) (circling "Sleepiness" and listing "edema" and "cough" as side effects); (Doc. 6-23, p. 35) (checking "NONE"); (Doc. 6-23, p. 20) (circling "NONE"); (Doc. 6-23, p. 10) (circling "NONE"); (Doc. 6-22, p. 96) (checking "NONE" but also noting "RT OTHER" urination issue);  (Doc. 6-22, p. 86) (checking "NONE");  (Doc. 6-22, p. 74) (checking "NONE"); (Doc. 6-22, p. 63) (checking "NONE"); (Doc. 6-22, p. 52) (checking "NONE").

In May 2016, Mallory Booth, a BPM certified physician assistant, saw Ms. Wade.  (Doc. 6-22, p. 6).  Ms. Booth noted that Ms. Wade had an antalgic gait.  (Doc. 6-22, p. 9).[12]  Still, Ms. Wade walked without a limp or an assistive device.  (Doc. 6-22, p. 9).  Ms. Booth provided the following assessment:

> Patient has consistently had compliance issues, and was told at the last visit that we will be holding a "zero tolerance" policy with her.  We were unable to count all her medication since some of her pills were crushed.  In just the past few visits, she has been overtaking her meds

---

[12] Antalgic means "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)[.]"  https://www.merriam-webster.com/medical/antalgic (last visited June 28, 2019).

or have had them stolen by friends/family. The controlled substance agreement that she (and all patients) signed at her new patient [visit] explains that she is responsible for all lost, stolen, or damaged medication. Since her medication today was partly damaged, and we cannot adequately determine compliance, we have no choice but to discontinue opioids. She was given a list of other pain management providers around, and instructed how to titrate off the medication she has now. Clonidine rx'd for withdrawal side effects if she suffers from any. She asked to try Lyrica. She had issues with edema in the past with Lyrica, so we will start her out on 50mg 1qd [once daily] for a week (and titrate down off [T]opamax by 50mg 1qd for 7 days). She will then increase the Lyrica by 1 pill qd for a week until she can tolerate Lyrica 50mg QID [four times daily]. If she has issues with edema, we can go back to the [T]opamax.

(Doc. 6-22, p. 9).

Dr. Chang expressed similar concerns about Ms. Wade's non-compliance with opiate treatment:

Ms. Wade has demonstrated compliance issues as detailed above on multiple occasions. We have till [sic] this point tried to establish parameters under which she may have been successful, if she were only able to comply with . . . those boundaries, but she has not been able to do so. Today, we have no choice but to discontinue the controlled medications. We can continue to prescribe her non-opiate pain medications and employ interventional procedures. However, at this point, there really is no recourse in terms of restarting her opiates in the future.

(Doc. 6-22, p. 9).

Ms. Wade stopped treatment with the BPC and began seeing Dr. Denver for pain management in October 2016. (Doc. 6-20, p. 26; Doc. 6-21, pp. 2-6). Ms. Wade continued to report pelvic, back, and knee pain. (Doc. 6-21, p. 2). Ms. Wade rated her pelvic pain as a seven to eight and her back pain as a seven. (Doc. 6-21, p.

2).  Ms. Wade reported that her back surgery did not provide much help.  (Doc. 6-21, p. 2).  She described her knee pain as "aching, grinding, and tight."  (Doc. 6-21, p. 2).

In November 2016, Dr. Denver prescribed Ms. Wade oxycodone (15 mg) for pain management.  (Doc. 6-20, pp. 21, 23).  Ms. Wade reported in December 2016 that the oxycodone gave her two and a half hours of relief "with 50% pain reduction."  (Doc. 6-20, p. 16).  She noted that the oxycodone "is not more effective than Percocet 10 mg."  (Doc. 6-20, p. 16).  Neither medication provided Ms. Wade "enough relief."  (Doc. 6-20, p. 16).  Ms. Wade rated her pain as a seven with six the best, seven the average, and eight the worst.  (Doc. 6-20, p. 16).  Despite her pain, Ms. Wade reported "caring for 3 children" and "constantly cleaning the house and cooking."  (Doc. 6-20, pp. 16-17).

During a visit in early January 2017, Ms. Wade's pain level was eight.  (Doc. 6-20, p. 11).  Ms. Wade reported fluctuating pain over the 30 preceding days with six as the best, seven as the average, and eight as the worst.  (Doc. 6-20, p. 11).  Dr. Denver's assessments included chronic intractable pain, pelvic and perineal pain, back pain, and degenerative disc disease.  (Doc. 6-20, p. 12).  Dr. Denver increased Ms. Wade's oxycodone strength from 15 to 20 mg to better manage Ms. Wade's pain.  (Doc. 6-20, pp. 11, 12).

Ms. Wade described her sleep as "not restful." (Doc. 6-20, p. 11). Ms. Wade's pain "mildly limited sexual activity and hobbies[;] moderately limit[ed] walking[,] bending[,] lifting[,] and sitting[;] and severely limit[ed] running[,] stair climbing[,]and working." (Doc. 6-20, p. 11).

At the end of January 2017, Ms. Wade reported that three was her "[c]urrent pain score" and that she had "much better control now with her current medications." (Doc. 6-20, p. 3). During the month of January 2017, three was Ms. Wade's best pain level, four was the average, and eight was the worst. (Doc. 6-20, p. 3). Ms. Wade expressed being "definitely better" on oxycodone (20 mg) four times daily with the exception of some pain waking her up at night. (Doc. 6-20, p. 3); (*see also* Doc. 6-20, p. 5) (noting that "[d]osing to 20 mg of oxycodone has definitely improved [back] pain control . . . . [except for] some breakthrough pain in the middle of the night").

Ms. Wade's pain continued to "mildly limit[]walking, sitting, sexual activity, and hobbies; moderately limit[] bending[,] lifting, and stair climbing; and severely limit[] running and working." (Doc. 6-20, p. 3). "Activity and stress increased pain." (Doc. 6-20, p. 3). "Medications and rest decreased pain." (Doc. 6-20, p. 3).

Dr. Denver recommended physical therapy and believed "a therapeutic exercise program could provide the difference to improve pain control." (Doc. 6-

20, p. 5).  Ms. Wade responded that she lacked "time or money to pursue this."  (Doc. 6-20, p. 5).

In March 2017, Dr. Denver continued to treat Ms. Wade for chronic pain. (Doc. 6-21, p. 22).  Ms. Wade reported six as her pain level with a best of four, an average of six, and a worst of eight and a half.  (Doc. 6-21, p. 22).  Ms. Wade's pain increased with activity and decreased with rest and medications.  (Doc. 6-21, p. 22). Ms. Wade described "aching and burning" pain "with some stabbing in both knees as well as in the lower abdominal region."  (Doc. 6-21, p. 22).  Ms. Wade felt "aching[,] stabbing and burning in [her] lower back with radiation into the lower left extremity."  (Doc. 6-21, p. 22).

Ms. Wade returned to Dr. Denver in May 2017 for chronic lower back pain and degenerative joint disease.  (Doc. 6-30, p. 58).  Dr. Denver reported that oxycodone relieved Ms. Wade's pain by 60% for hours without side effects.  (Doc. 6-30, p. 58).  Ms. Wade continued to take tizanidine (4 mg) for lower back pain without side effects.  (Doc. 6-30, pp. 58, 60).[13]

Dr. Rossman is an oncologist who treated Ms. Wade's chronic lymphocytic leukemia (CLL) of B-cell type.  (Doc. 6-18, pp. 16, 18).  In March 2015, Dr. Rossman reported that Ms. Wade has "had CLL for probably 10 years and will likely

---

[13] "Tizanidine is a short-acting muscle relaxer.  It works by blocking nerve impulses (pain sensations) that are sent to [a person's] brain." https://www.drugs.com/tizanidine.html (last visited July 3, 2019).

never need therapy for it." (Doc. 6-18, p. 33). Dr. Rossman noted during a follow-up visit in March 2016 that Ms. Wade's CLL had been in remission since October 2015. (Doc. 6-18, p. 16).

In August 2016, Ms. Wade contacted Dr. Rossman's office and explained she was having trouble affording visits to the pain clinic. (Doc. 6-21, p. 53). Dr. Rossman's office contacted the pain clinic, obtained more information, and left a voicemail message for Ms. Wade. (Doc. 6-21, p. 53). Ms. Wade called Dr. Rossman's office back and indicated that she would "call the pain clinic [to] see if [it] will work with her on payments so she can go." (Doc. 6-21, p. 53). As of March 2017, Dr. Rossman found no evidence that Ms. Wade's chronic CLL had progressed. (Doc. 6-30, pp. 51, 52).

Ms. Wade saw Dr. Russell in February 2017 for a consultative examination at the Commissioner's request. (Doc. 6-21, p. 8). Dr. Russell diagnosed Ms. Wade with chronic back pain, left leg sciatica, chronic abdominal pain, dysesthesias, chronic pelvic and perineal pain, multiple abdominal procedures with scar tissue, chronic lymphocytic leukemia, MRSA infection in the past, gastritis, irritable bowel syndrome, right knee injury with PCL injury, breast reduction surgery, bladder sling (two times); abscesses (three times); tobacco use, TMJ syndrome, immunoglobulin

deficiency, depression, and headaches. (Doc. 6-21, p. 11).[14]

Dr. Russell identified back and pelvic pain as two of Ms. Wade's chief complaints. (Doc. 6-21, p. 8). Ms. Wade reported that her back pain "is pretty much constant" and "can be sharp and aching in nature." (Doc. 6-21, p. 8). Ms. Wade indicated that back surgery had not been helpful. (Doc. 6-21, p. 8). When Ms. Wade turned her back, she had "a crunching-like sensation." (Doc. 6-21, p. 8). "[F]airly frequently[,]" Ms. Wade's back pain would "radiate[] down the left leg all the way to the foot that is sharp in nature." (Doc. 6-21, p. 8). Dr. Russell found that this back pain limited Ms. Wade's ability to carry, lift, walk, and stand. (Doc. 6-21, p. 8). Ms. Wade rated her back pain with medications as six out of ten; without medication as about an eight. (Doc. 6-21, p. 8).

Ms. Wade reported having constant abdominal and pelvic pain. (Doc. 6-21, p. 9). Ms. Wade rated this pain as a seven with medication and a nine without medication. (Doc. 6-21, p. 9). Sometimes that pain was "a deep, aching sensation particularly in the left lower quadrant"; other times it was "sharp and stabbing[.]" (Doc. 6-21, p. 9).

---

[14] Ms. Wade's chronic lymphocytic leukemia is the likely source of her recurrent MRSA infection (Methicillin-Resistant Staphylococcus Aureus). (Doc. 6-18, p. 33). Temporomandibular Joint Syndrome, or TMJ, causes pain in the jaw joint and pain in the muscles that control the jaw. *See* https://www.mayoclinic.org/diseases-conditions/tmj/symptoms-causes/syc-20350941 (last visited May 28, 2019).

Dr. Russell reported that Ms. Wade had no trouble getting on and off the examination table and had normal strength. (Doc. 6-21, pp. 10, 11). Dr. Russell found that Ms. Wade's range of motion in her back and her gait were abnormal. (Doc. 6-21, p. 10). Dr. Russell observed tenderness in Ms. Wade's right knee and back. (Doc. 6-21, p. 10).

Dr. Russell concluded that Ms. Wade's fine motor skills, handling, fingering, gripping, feeling, and reaching were normal. (Doc. 6-21, p. 11). Dr. Russell determined that Ms. Wade "would be sensitive to environmental exposures" and would have difficulty or trouble with carrying, lifting, pushing, pulling, sitting, standing, walking, climbing, stooping, bending, crawling, kneeling, and crouching. (Doc. 6-21, p. 11). In a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form, Dr. Russell reported that Ms. Wade could occasionally lift and carry up to ten pounds, but never lift or carry more than ten pounds. (Doc. 6-21, p. 15). Dr. Russell restricted the hours that Ms. Wade could sit without interruption to two; stand and walk without interruption to one. (Doc. 6-21, p. 16). During a full work day, Ms. Wade could sit for four hours, stand for three, and walk for two. (Doc. 6-21, p. 16). Dr. Russell limited to occasionally Ms. Wade's ability to use her hands to push or pull. (Doc. 6-21, p. 17).

Though Dr. Russell found that Ms. Wade was unable to perform more than a range of sedentary work, the ALJ rejected Dr. Russell's opinion as inconsistent with

other medical records and reported daily activities.  (Doc. 6-3, p. 37).[15]  But there are no other medical records that describe the amount of weight that Ms. Wade can carry or the number of hours she can stand.  The ALJ reasoned that because the Alabama Pain Physicians, the BPC, and Dr. Denver did not restrict Ms. Wade's physical functioning, Dr. Russell's findings were inconsistent with "the claimant's longitudinal treating medical records[.]"  (Doc. 6-3, p. 37).

Eleventh Circuit precedent does not permit an ALJ to discredit an uncontradicted finding based only on silence in medical records.  As the Eleventh Circuit has instructed "[s]uch silence is equally susceptible to either [disability] inference, therefore, no inference should be taken."  *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *see also Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982) ("An administrative law judge may not arbitrarily reject uncontroverted medical testimony.") (citing *Goodley v. Harris*, 608 F.2d 234 (5th Cir. 1979)).[16]

The ALJ relied on no medical opinion in concluding that Ms. Wade could physically handle medium work.  *See Graham v. Bowen*, 786 F.2d 1113, 1115 (11th

---

[15]  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

[16]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Cir. 1986) (reversing because the ALJ substituted his lay opinion about the claimant's gait for the medical evidence showing more than a moderate limitation); *Storey v. Berryhill*, ___ Fed. Appx. ___, No. 17-14138, 2019 WL 2480135, at *8 (11th Cir. June 13, 2019) (citing *Graham* and observing that "it is generally improper for an ALJ to substitute his own judgment for that of a medical expert because ALJs are not medical experts").  The vocational expert testified that medium work would require two hours of uninterrupted standing and/or walking and usually eight hours for an entire shift.  (Doc. 6-5, p. 87).  Dr. Russell's opinion indicates that Ms. Wade cannot fulfill the physical demands of medium work, and there are no medical records that suggest that she can perform medium work.  Consequently, the ALJ's decision to give Dr. Russell's opinion "little weight" finds little support in the record. (Doc. 6-3, p. 37).

Here, the Court finds that the totality of the objective medical evidence substantiates Ms. Wade's credibility.  Ms. Wade's medical records demonstrate that she had pelvic surgery to remove a mass which caused scaring, she underwent surgery and other procedures to address her back pain, and she suffers from degenerative back and knee conditions.  *See Kent v. Sullivan*, 788 F. Supp. 541, 544 (N.D. Ala. 1992) ("When all the evidence is considered Mr. Kent was clearly suffering from several medically determined impairments that could reasonably be expected to produce the pain he described.").  For years, Ms. Wade sought treatment

to relieve her pelvic, back, and knee pain.  *See Collins v. Astrue*, No. 2:06-CV-365-FTM-DNF, 2008 WL 477802, at *6 (M.D. Fla. Feb. 19, 2008) ("The Plaintiff's back problems have been documented throughout the record and by accepted diagnostic tests."); *see also Moody v. Barnhart*, 295 F. Supp. 2d 1278, 1284 (N.D. Ala. 2003) ("Without question severe degenerative disc disease can cause disabling pain.") (citing *Jenkins v. Sullivan*, 906 F.2d 107, 109 (4th Cir. 1990) (noting that degenerative disc disease is a condition that could reasonably be expected to produce disabling pain)); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) ("cervical nerve root compression syndrome . . . scoliosis and degenerative disc disease" are impairments that could reasonably be expected to cause . . . pain")).

The objective evidence shows that Ms. Wade has experienced some relief with medication. (*See* Doc. 6-9, pp. 69-79) (pharmacy records from 2015 to 2017 documenting regular oxycodone refills).  But the improvement in Ms. Wade's chronic pain has not been linear—Ms. Wade's pain has fluctuated.  For example, Ms. Wade experienced some pain relief after Dr. Denver increased her oxycodone to 20 mg in January 2017.  Ms. Wade reported a pain score of three.  By March 2017, Ms. Wade's pain level had returned to a six.  Ms. Wade's records contain evidence that Ms. Wade may have addiction issues relating to her opioid pain medication, but no physician has suggested that Ms. Wade does not need significant pain treatment.

The ALJ did not identify objective medical evidence that indicates that Ms. Wade is exaggerating her subjective symptoms to the extent that she is able— despite her severe pelvic, back, and knee impairments—to perform medium work, lifting up to 50 pounds and regularly lifting up to 25 pounds. *See Stricklin v. Astrue*, 493 F. Supp. 2d 1191, 1197 (N.D. Ala. 2007) ("That the plaintiff's medications were helping relieve his symptoms does not follow to the ALJ's conclusion that the plaintiff's symptoms were reduced to the point w[h]ere he could maintain full-time employment.") (alternation added); *see also* SSR 96-8p, 1996 WL 374184, at *1 ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). Thus, the objective evidence does not support the ALJ's determination that Ms. Wade's pain does not preclude medium work. *Cf. Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) ("An ALJ may not make purely speculative inferences from medical reports.").

## C. Daily Activities

When examining daily activities, an ALJ must consider the record as a whole. *See, e.g., Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (faulting the Appeals Council's finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her

daily activities have been significantly affected"); *Martz v. Comm'r of Soc. Sec.,* 649

Fed. Appx. 948, 957 (11th Cir. 2016). The Eleventh Circuit has recognized that

"participation in everyday activities of short duration" will not prevent a claimant

from proving disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).

Instead, "[i]t is the ability to engage in gainful employment that is the key, not

whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*,

481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see, e.g., Flynn v. Heckler*, 768 F.2d

1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television,

embroider[s], attend[s] church, and drive[s] an automobile short distances . . . .

performs housework for herself and her husband, and accomplishes other light duties

in the home" still may suffer from a severe impairment); *Smith,* 637 F.2d at 971-72

("[S]poradic or transitory activity does not disprove disability.").

Ms. Wade argues that the ALJ improperly evaluated her daily activities

because he did not discuss "her limiting description of them." *Horton v. Barnhart*,

469 F. Supp. 2d 1041, 1047 (N.D. Ala. 2006). The ALJ summarized the daily

activity evidence this way:

> The claimant reported in her function report that she cared for children,
> prepared meals, did housework, drove daily, shopped in stores, and
> watched television. In addition, the claimant reported no problems with
> her memory, completion of tasks, concentration, understanding,
> following instructions, or getting along with others. She reported that
> she could pay attention as long as needed (no problems), could finish
> what she started, and could follow instructions very well. The claimant
> reported to Dr. Neville [a consultative psychologist] that she cared for

children, cooked, did laundry, drove, and shopped for groceries. Although the claimant testified that she spent up to five hours each day in a recliner, and had a significant[] limitation of ability to lift, carry, sit, stand, and walk, these allegations are not consistent with her treating medical records or with the activities she has previously reported. In addition, her treating medical records do not indicate that she had had significant medication side effects. The claimant's reported daily activities are not consistent with disabling pain or limitations.

(Doc. 6-3, pp. 36-37; Doc. 6-17, p. 48).

The ALJ's discussion of the daily activity evidence omits several limitations which Ms. Wade described in her testimony at the administrative hearing. For example, Ms. Wade indicated that on a normal morning, she "sit[s] down until [she] ha[s] energy to do anything" and that during the day she is "usually sitting." (Doc. 6-9, p. 30). Ms. Wade's husband regularly brings something home for dinner or cooks. (Doc. 6-9, pp. 30, 32). Ms. Wade provides simple breakfast and lunch items for her children and no longer prepares complete meals. (Doc. 6-9, pp. 32, 31).

Ms. Wade watches her children when they are home and her husband is at work. (Doc. 6-9, p. 31). Ms. Wade dresses her children during the week and her husband does that on the weekends. (Doc. 6-9, p. 31). Ms. Wade takes her children to doctor appointments. (Doc. 6-9, p. 31). At night, Ms. Wade bathes her children. (Doc. 6-9, pp. 30, 31). Her husband dries them off, helps them with their pajamas, and tucks them into bed. (Doc. 6-9, pp. 30, 31). Ms. Wade's husband takes care of their animals. (Doc. 6-9, p. 31).

Ms. Wade cannot do yard work because it aggravates her back, knee, and abdominal pain. (Doc. 6-9, pp. 32, 33). Ms. Wade also lacks energy for outside work. (Doc. 6-9, p. 33). Ms. Wade cleans for up to two hours daily for one room. (Doc. 6-9, p. 32). Ms. Wade washes one to two loads of laundry two to three days weekly. (Doc. 6-9, p. 32). Ms. Wade washes dishes twice weekly. (Doc. 6-9, p. 32).

Ms. Wade buys groceries and items for her children. (Doc. 6-9, p. 33). She shops biweekly, and the process takes her two hours. (Doc. 6-9, pp. 33, 34). Ms. Wade visits her mother weekly. (Doc. 6-9, p. 34). Ms. Wade's hobbies and interests include reading, watching television, and playing computer games. (Doc. 6-9, p. 34).

Having considered the full scope of Ms. Wade's daily activities, the Court finds that caring for her herself and her children with her husband's help, driving, shopping biweekly, making simple meals, performing household chores with limitations, visiting her mother weekly, reading, watching television, and playing games "do not rule out the presence of disabling pain" that would preclude her from performing medium work." *Horton*, 469 F. Supp. 2d at 1046. "The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean" Ms. Wade can do medium work. *Horton*, 469 F. Supp. 2d at 1046; *see also Lewis*, 125 F.3d at 1441 (The claimant's "participation in everyday activities of short

duration, such as housework or fishing, [did not] disqualify[y] [him] from disability or [was] inconsistent with the limitations recommended by [his] treating physicians."). Consequently, substantial evidence does not support the ALJ's negative credibility determination.

## V.    CONCLUSION

The Court remands the Commissioner's decision for further administrative proceedings consistent with this memorandum opinion finding that the medium work RFC is not supported by substantial evidence. The conclusion that Ms. Wade can lift up to 50 pounds and frequently lift or carry 25 pounds is not supported by substantial evidence.

The Court does not find that Ms. Wade is disabled within the meaning of the Social Security regulations. The Court expresses no opinion in that regard. The ALJ must determine whether Ms. Wade may be capable of light or sedentary work. The record contains testimony from the vocational expert regarding Ms. Wade's ability to perform sedentary work and the transferability of her nursing skills. (Doc. 6-5, pp. 82-89). The ALJ must examine the evidence and determine whether there are jobs in the economy that Ms. Wade can perform.

**DONE** this 6th day of August, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE